UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TIMOTHY B. DAVIS,

                            Plaintiff,

v.                                          5:06-CV-0530
                                          (GHL)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

_____

APPEARANCES:                                OF COUNSEL:

MCMAHON, KUBLICK & SMITH, P.C.      JENNIFER GALE SMITH, ESQ.
Counsel for Plaintiff
500 South Salina Street
Syracuse, New York 13202

HON. GLENN T. SUDDABY             TOMASINA DIGRIGOLI, ESQ.
United States Attorney for the           Special Assistant U.S. Attorney
     Northern District of New York
Counsel for Defendant                 BARBARA L. SPIVAK, ESQ.
P.O. Box 7198                          Regional Chief Counsel, S.S.A.
100 S. Clinton Street
Syracuse, New York 13261-7198

GEORGE H. LOWE, United States Magistrate Judge

## **MEMORANDUM DECISION AND ORDER**[1]

**I.      BACKGROUND**

      **A.      Procedural History**

     Plaintiff filed an application for disability insurance benefits on January 27, 2004.

(Administrative Transcript ("T") at 57-59.)  The application was denied (T. at 31-35) and

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (T. at 36).  The

_____

[1]     This matter is before the Court by consent of both parties.  (Dkt. No. 12.)

hearing was held on July 18, 2005.  (T. at 463-485.)  On February 24, 2006, the ALJ issued a decision finding that Plaintiff was not disabled.  (T. at 12-21.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on April 19, 2006. (T. at 5-7.)  Plaintiff commenced this action on May 1, 2006.  (Dkt. No. 1.)

> **B.      The Contentions**

Plaintiff makes the following claims:

(1)      The ALJ erroneously failed to consider the evaluations by Plaintiff's treating physicians. (Dkt. No. 7 at 6-10.)

(2)      The ALJ's finding that Plaintiff has the residual functional capacity ("RFC") to perform jobs that exist in significant number in the national economy is not supported by substantial evidence.  (Dkt. No. 7 at 11-12.)

(3)      The ALJ did not properly consider Plaintiff's pain.  (Dkt. No. 7 at 13.)

Defendant contends that the ALJ's decision is supported by substantial evidence and thus should be affirmed.  (Dkt. No. 8.)

## II.      APPLICABLE LAW

### A.      Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2004).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which exists
> in the national economy, regardless of whether such work exists in
> the immediate area in which he lives, or whether a specific job
> vacancy exists for him, or whether he would be hired if he applied
> for work.

42 U.S.C. § 1382c(a)(3)(B) (2004).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)),

the Social Security Administration ("SSA") promulgated regulations establishing a five-step

sequential evaluation process to determine disability.  20 C.F.R. § 416.920 (2007).  "If at any step

a finding of disability or non-disability can be made, the SSA will not review the claim further."

*Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

> At the first step, the agency will find non-disability unless the
> claimant shows that he is not working at a "substantial gainful
> activity."  [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At step two,
> the SSA will find non-disability unless the claimant shows that he
> has a "severe impairment," defined as "any impairment or
> combination of impairments which significantly limits [the
> claimant's] physical or mental ability to do basic work activities."
> [20 C.F.R.] §§ 404.1520(c), 416.920(c).  At step three, the agency
> determines whether the impairment which enabled the claimant to
> survive step two is on the list of impairments presumed severe
> enough to render one disabled; if so, the claimant qualifies.  [20
> C.F.R. §§] 404.1520(d), 416.920(d).  If the claimant's impairment
> is not on the list, the inquiry proceeds to step four, at which the
> SSA assesses whether the claimant can do his previous work;
> unless he shows that he cannot, he is determined not to be disabled.
> If the claimant survives the fourth stage, the fifth, and final, step
> requires the SSA to consider so-called "vocational factors" (the
> claimant's age, education, and past work experience), and to
> determine whether the claimant is capable of performing other jobs
> existing in significant numbers in the national economy.  [20
> C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

3

*Barnhart v. Thomas*, 540 U.S. at 24-25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Serrano v. Barnhart*, Civ. No. 02-6372, 2003 WL 22683342, at *11 (S.D.N.Y. Nov. 14, 2003). If the plaintiff-claimant meets his or her burden of proof on all four steps, the burden then shifts to the defendant-Commissioner to prove that the plaintiff-claimant is capable of performing other jobs which exist in significant numbers in the national economy. *Id.* (citing *Barnhart v. Thomas*, 540 U.S. at 25; other citations omitted).

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Brown v. Barnhart*, Civ. No. 02-4523, 2003 WL 1888727, at *4 (S.D.N.Y. Apr. 15, 2003); *Serrano v. Barnhart*, 2003 WL 22683342, at *10; *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2005); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258

(2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered

throughout the administrative record.  *Serrano*, 2003 WL 22683342, at *10; *Richardson v.

Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197

(1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from both sides,

because an analysis of the substantiality of the evidence must also include that which detracts

from its weight."  *Williams*, 859 F.2d at 258.  However, a reviewing court cannot substitute its

interpretation of the administrative record for that of the Commissioner if the record contains

substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.

1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

III.   **THE PLAINTIFF**

Plaintiff was born on September 8, 1971.  (T. at 57.)  He completed school through the

eleventh grade.  (T. at 336, 467.)  Plaintiff has worked in construction, as a taxi driver, as a

factory worker, as a garbage collector and as a printer.  (T. at 67-68.)  Plaintiff alleges disability

due to back pain and depression.  (T. at 66.)

IV.   **THE ALJ'S DECISION**

The ALJ found that Plaintiff (1) meets the insured status requirements of the Social

Security Act through March 31, 2007; (2) has not engaged in substantial gainful activity at any

time relevant to the decision; (3) suffers from the severe impairments of degenerative disc

disease, herniated nucleus pulposis, status post lumbar laminectomy syndrome and depression;

(4) does not have an impairment or combination of impairments that meets or medically equals a

5

listed impairment; (5) has the RFC to perform work that does not require exertion above the

sedentary to light level, more than simple routine repetitive tasks, or more than occasional

stooping, kneeling, crawling, crouching, balancing, or climbing; (6) is not able to perform any of

his past relevant work; (7) is a 'younger individual'; (8) has a limited education and is able to

communicate in English; and (9) is capable of performing jobs that exist in significant number in

the national economy.

## V.   DISCUSSION

### A.   The ALJ Failed to Adequately Consider the Opinions of Plaintiff's Treating Physicians.

Plaintiff argues that the ALJ erred by failing to give adequate consideration to the

opinions of Plaintiff's treating physicians, Michael J. Vives, M.D. and Scott Gingold, M.D.

(Dkt. No. 7 at 6-10.)  Plaintiff is correct.

The medical opinions of a treating physician are given "controlling weight" as long as

they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques"

and are not inconsistent with other substantial evidence contained in the record.  20 C.F.R. §

404.1527(d)(2) (2007)[2].

"An ALJ who refuses to give controlling weight to the medical opinion of a treating

physician must consider various 'factors' to determine how much weight to give to the opinion."

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  These factors include: (1) the length of the

treatment relationship and frequency of examinations; (2) the nature and extent of treatment

---

[2]      Plaintiff's brief recites an outdated standard for the Treating Physician's Rule. (Dkt. No. 7 at 6.)
The standard Plaintiff cites was superceded by the adoption of new Regulations in 1991.  *Schall v. Apfel*, 134 F.3d
496, 503-504 (2d Cir. 1998).

relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the

opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other

factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2) (2007).

The Commissioner's notice of determination or decision must "give good reasons" for the

weight given a treating source's opinion.  20 C.F.R. §§  404.1527(d)(2), 416.927(d)(2) (2007).

Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician

is a ground for remand.  *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999).

Dr. Vives treated Plaintiff regularly for back pain from August 2002 through May 2003.

(T. at 113-140.)  In September 2002, Dr. Vives performed an L5-S1 discectomy on Plaintiff.  (T.

at 130.)  In his reports of Plaintiff's first three post-operative visits, Dr. Vives expressed

optimism that Plaintiff could return to work after a few weeks of physical therapy.  However,

after each of these appointments, Dr. Vives recommended further physical therapy rather than an

immediate return to work[3].  (T. at 124-125, 128-129, 130-131.)

On December 19, 2002, Dr. Vives noted that Plaintiff "has returned to work at light duty

and he has not had any problems.  He has made good progress in physical therapy, and has been

discharged.  He apparently was moving objects over 100 pounds at that (sic)  time he was

discharged without any difficulty ...He feels as if he can return to his job fully (sic) duty at this

---

[3]  In late September 2002, Dr. Vives noted that Plaintiff could return to work in four weeks "if he is making good progress ... however, I do believe he will likely require a short course of physical therapy before returning to his normal work activity."  (T. at 130-131.)  On October 24, 2002, Dr. Vives noted that Plaintiff "has a heavy labor component to his job and no light duty available (so) I am going to have him begin a physical therapy program ...I will see him back in four weeks.  If has made substantial improvements he may return to work at that time.  If he is still having difficulty he may require a brief work reconditioning program."  (T. at 128-129.)  On November 21, 2002, Dr. Vives noted that because Plaintiff "has a heavy labor component to his job, I have recommended he continue physical therapy for an additional four weeks ... I will see him back at that time to monitor his progress.  If he continues to make good progress, I am hopeful that he will be able to return to work at that time." (T. at 124-125.)

time[4]."  (T. at 122.)

On January 16, 2003, Dr. Vives noted that Plaintiff

> came to talk with me today because he had some difficulty at work.
> Apparently, he was fired from working on the landscaping crew and
> they tried to have him take a new job, which is a much heavier labor
> type position ... The duties that were expected of him on the new job
> were much more and he felt he was not quite ready to take that on yet
> ...This patient has been very straight forward throughout his entire
> course.  He was doing so well postoperatively, that he asked me if he
> could return to his job full duty and I was surprised that he was ready
> to go back to work so quickly despite the fairly heavy labor
> component to his job.  He never displayed any physical findings
> consistent with symptomatic magnification and he is (sic) always
> been completely compliance (sic) with all my instructions."

(T. at 120.)

From January through April 2003, Dr. Vives noted steady improvement.  However, he

also steadily decreased the amount he recommended that Plaintiff could lift, from a January 2003

recommendation of 100 pounds above waist level and 60 pounds above shoulder height to an

April 2003 recommendation of 20 pounds[5].

---

[4]    Defendant characterizes this as Dr. Vives 'encouraging' Plaintiff to return to work.  (Dkt. No. 8 at 20.)

[5]    On January 24, 2003, Dr. Vives cleared Plaintiff to return to work "with the following restrictions. No lifting greater than 100 pounds above waist level.  No lifting greater than 60 pounds above shoulder height.  He can operate heavy machinery, however ... he may require additional work reconditioning if the task requires rapid movements involving his trunk.  For any heavier duty type activities than those outlined above, he may require additional period of work reconditioning."  (T. at 119.)

On February 20, 2003, Dr. Vives noted that Plaintiff "had been doing well up until Saturday morning when he states that he woke up with a pain in his back radiating down his left leg ... The patient is to begin a physical therapy program at this time."  (T. at 118.)  On March 20, 2003, Dr. Vives noted that Plaintiff "continues to have radiating leg pain down the left leg.  He also has paresthesias and numbness in the same distribution ... I believe he should continue in the physical therapy program and have an MRI ... to evaluate for the possibility of recurrent disc herniation ... The patient can return to work with work restrictions of no lifting greater than 30 pounds; no excessive bending, lifting or twisting."  (T. at 117.)

On March 20, 2003, Dr. Vives noted that Plaintiff "continues to have radiating leg pain down the left leg. He also has paresthesias and numbness in the same distribution ... I believe he should continue in the physical therapy program and have an MRI ... to evaluate for the possibility of recurrent disc herniation ... The patient can

8

On May 8, 2003, Dr. Vives noted that

> Plaintiff has improved substantially clinically.  Since that is the case,
> he is going to be transitioned to a home exercise program at this time,
> which he will continue indefinitely.  I did caution him that he likely
> may have episodes in the future where he may have an exacerbation
> of the pain.  However, hopefully, he will continue to have an overall
> benign clinical course.  He apparently is moving to the Syracuse
> Upstate, New York area ...(H)e states he is probably able to return to
> work, however, since he is currently moving, he does not plan to seek
> new employment until he gets settled in his new location.

(T. at 113.)

Plaintiff did not obtain a treating physician when he moved to Syracuse.  (T. at 346.)  In
January 2004, Plaintiff filed his application for disability insurance benefits.  (T. at 57-59.)  From
August 2004 through January 2005, as discussed more fully below, Plaintiff sought treatment
from a pain management center,  a chiropractor, and a physical therapist.  (T. at 384-385, 414-
426.)

In January 2005, Plaintiff returned to Dr. Vives. (T. at 427-431.)  Dr. Vives noted that
Plaintiff:

> states the main pain ... is... in his lower back ... It is worse with any
> prolonged sitting... I believe the patient most likely has a progression
> of his lumbar disc degeneration.  At the time of his surgery, we noted

---

return to work with work restrictions of no lifting greater than 30 pounds; no excessive bending, lifting or twisting."
(T. at 117.)

On April 3, 2003, Dr. Vives noted that Plaintiff "overall is clinically improving.  I would like him to
continue physical therapy for (an) additional three weeks, and then be transitioned to home exercise program.  I will
see him back in about four weeks to monitor his progress.  If he continued to make good progress, then he will not
need any further intervention.  If he has persistent symptoms or increasing symptoms, then I believe an epidural
steroid injection is worth a try... We did have some preliminary discussions about revisions discectomy, however, he
believes the symptoms are not severe enough to warrant that and he will wish to avoid any further surgery at this
time.  (Plaintiff) is currently between jobs.  From my standpoint, if he were to able to find employment, he should
restrain from any heavy labor at this time until physical therapy is completed.  This should involve no lifting greater
than 20 pounds, no excessive bending, lifting, or twisting."  (T. at 115-116.)

> that his disc was extremely degenerated although he did have a large
> disc herniation which we removed ... I believe at this time the
> recommended management should include an MRI of his lumbar
> spine ... If, as I suspect, it demonstrates an advanced disc
> degeneration confined to L5-S1, he may be a candidate for a lumbar
> fusion surgery to address the ongoing chronic back pain ... Since his
> entire life, he has worked mostly in labor type activities ... I do
> believe that his chances for return to work even with a successful
> surgery are ... probably more on the order of 60%."

(T. at 430.)

On March 29, 2005, Dr. Vives recommended that Plaintiff undergo surgery. Dr. Vives

explained to Plaintiff that after surgery:

> most patients will need about six months of postoperative physical
> therapy before being able to attempt to go back to work and if they
> are not able to go back to work at that time they typically would be
> considered at maximum medical improvement. Any further
> limitations at that time would be considered most likely permanent.

(T. at 427.)

After consulting with Dr. Vives in 2005, Plaintiff sought treatment from Dr. Gingold. (T.

at 401-410.) Dr. Gingold concurred with Dr. Vives that further surgery was necessary (T. at

409). On May 17, 2005, Dr. Gingold assisted with the surgery. (T. at 438.) The record contains

notes of five post-surgery appointments with Dr. Gingold. (T. at 401-405.)

Dr. Vives and Dr. Gingold both provided Medical Source Statements in conjunction with

Plaintiff's application for disability insurance benefits. (T. at 374-381.) Each statement was

completed less than a month after Plaintiff's second surgery.

In relevant part, Dr. Vives found that Plaintiff (1) could lift and/or carry ten pounds

occasionally and less then ten pounds frequently; (2) could stand and/or walk less than two hours

in an eight-hour workday; (3)could sit less than six hours in an eight-hour workday; (4) had

limitations on pushing and/or pulling in both the upper and lower extremities; (5) could not climb; (6) could not balance; (7) could not kneel; (8) could not crouch; (9) could not crawl; and (10) could not stoop.  (T. at 378-379.)

In relevant part, Dr. Gingold found that Plaintiff could (1) not lift or carry any weight; (2) stand and/or walk less than two hours in an eight-hour workday; (3) sit less than six hours in an eight-hour workday; (4) not push and/or pull; (5) not climb; (6) not balance; (7) not kneel; (8) not crouch; (9) not crawl; and  (10) not stoop.  (T. at 374-375.)

The ALJ stated that he:

> considered Dr. Gingold's and Dr. Vives' opinions and treatment notes and findings and f(ou)nd that they do not require me to conclude that the claimant is disabled for any period of 12 consecutive months. The undersigned notes that Dr. Vives opined in March 2005 that, typically, only six months of postoperative therapy was required before going back to work.  These physicians' examinations provide a basis for pain and for the finding of some limitation in lifting, carrying, and postural movements but none that would rule out work at the sedentary to light exertional level.

(T. at 17.)  Essentially, the ALJ rejected the treating physicians' assessments because he (1) found they did not support a finding of disability for 12 months; and (2) found them inconsistent with the record as a whole.  Neither reason is supported by substantial evidence.    The ALJ's statement that the treating physicians' opinions "do not require me to conclude that the claimant is disabled for any period of 12 consecutive months" contradicts his own finding at Step Two that "the claimant has ...severe impairments."  (T. at 14.) Under the Regulations, a "severe impairment" is a "medically determinable physical or mental impairment" that has lasted or is expected to last "for a continuous period of at least 12 months."  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii) (2007).  By finding that Plaintiff's impairment was "severe", the ALJ

11

determined that the impairment had lasted or was expected to last for 12 months.  Further, to the

extent that Dr. Vives' statement created any ambiguity about whether Plaintiff's limitations had

lasted or would last for 12 months, the ALJ was under a duty to develop the record by

recontacting Dr. Vives to clarify the ambiguity.  20 C.F.R. § 404.1512(e) (2007).  This duty

existed even though Plaintiff was represented by counsel.  *Perez v. Chater*, 77 F.3d 41, 47 (2d

Cir. 1996).

The treating physicians' assessments are consistent with the record as a whole.  Bruce

Johnson, M.D., an independent medical examiner, opined on September 3, 2003,  that "the

objective medical findings ... have resulted in a permanent orthopedic disability of 60% of total."

(T. at 147.)

Examining physician Myra Shayevitz, M.D., opined on February 26, 2004, that "there are

limitations on very prolonged sitting.  However, the claimant can sit in relative comfort as long

as he can change his position and shift his weight.  There are limitations in very prolonged

walking."  (T. at 342.)   Dr. Shayevitz did not define what she meant by "very prolonged".

In August 2004, Plaintiff was referred to a pain management center.  Plaintiff's gait and

station were normal.  Paraspinous tenderness was noted with sacroiliac joint tenderness on the

left side.  Examination of the low extremities found no swelling, tenderness, crepitation, or

discoloration and full range of motion without limitations.  It was recommended that Plaintiff

stop taking ibuprofen and begin taking Mobic[6], Ultracet[7] and Neurontin[8].  A nerve block and physical therapy were also recommended.  The center determined that it would send Plaintiff for a surgical consult if his pain persisted after nerve block therapy.  (T. at 384-385.)  The center did not offer any opinion regarding Plaintiff's ability to perform work-related activities.

Plaintiff saw chiropractor James Walzer 17 times in December 2004 and January 2005. In his record of each visit, Dr. Walzer noted that Plaintiff was "progressing satisfactorily" but that he "should be at reduced activity."  (T. at 414-418.)  Dr. Walzer did not define what he meant by "reduced activity".

The only assessment in the record that explicitly opined that Plaintiff  had abilities greater than those found by the treating physicians is that of "P.Bacorn, Anaylst II", a non-examining source.  On March 3, 2004, the analyst opined that Plaintiff could (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for a total of about six hours in an eight hour workday; (4) sit for a total of about six hours in an eight hour workday, but must periodically alternate sitting and standing to relieve pain or discomfort; and (5) push and/or pull unlimited.  (T. at 345.)  The analyst opined that Plaintiff "alleges back pain and discomfort when standing for greater than 1 hour, if he sits too long ... The allegations are not fully credible.  The claimant's condition does appear to be improved since back surgery and he appears capable of light work."  (T. at 348.)  The analyst offered this opinion before Plaintiff's

---

[6]        Mobic is a prescription non-steroidal anti-inflammatory drug.  The PDR Pocket Guide to Prescription Drugs 879 (Bette LaGow ed., 7th ed. 2005).

[7]        Ultracet is used to treat moderate to severe pain for a period of five days or less. *Id*. at 1519.

[8]        Neurontin is usually used to treat seizures or residual pain from shingles.  *Id*. at 931.  Here, Plaintiff was to "trial" Neurontin "for neuropathic pain".  (T. at 385.)

second surgery.

The record does not contain any information about the analyst's professional qualifications.  This violates Social Security Administration internal procedures set out in the Hearings, Appeals and Litigation Law Manual ("the HALLEX").  Under the HALLEX, the ALJ is required to "admit into the record a statement of the ... qualifications" of any health care professional whose assessment is admitted into the record.  HALLEX I-2-1-30(A).

The Second Circuit has not ruled on the question of whether a federal court must enforce provisions of the HALLEX.  *Compare Moore v. Apfel,* 216 F.3d 864, 868 (9th Cir. 2000)("HALLEX is a purely internal manual and as such has no legal force and is not binding."), *with Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) ("While HALLEX does not carry the authority of law, this court has held that where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than would otherwise be required.") (citations and internal quotation marks omitted).  However, the Second Circuit has held that another internal Social Security Administration manual is not binding.  *See Tejada v. Apfel,* 167 F.3d 770, 775 (2d Cir. 1999) (holding that "POMS guidelines 'ha[ve] no legal force, and [they] do [ ] not bind the [Commissioner].' " (alteration in original)

Even if the HALLEX is not binding on this Court, the ALJ's failure to include the analyst's professional qualifications in the record is problematic.  ALJs may consider "medical opinions".  20 C.F.R. § 404.1512(b)(2) (2007).  "Medical opinions are statements from physicians ... or other acceptable medical sources that reflect judgments about the nature and severity of (a plaintiff's) impairments." 20 C.F.R. § 404.1527(a)(2)(2007).  Here, the Court cannot determine whether the assessment was completed by a physician, an acceptable medical

14

source, or neither.  It is thus not clear on this record whether or not the analyst's assessment qualifies as a medical opinion.

The ALJ's rejection of the treating physicians' assessments is not supported by substantial evidence.  The ALJ's finding that the treating physicians' assessments did not support a finding that Plaintiff was disabled for a 12-month period contradicts his finding that Plaintiff suffered from severe impairments.  Every doctor's opinion in the record is consistent with the treating physicians' assessments.  Accordingly, remand is appropriate.

**B.** **The ALJ's Finding That Plaintiff Had the RFC to Perform Other Work is Not Supported by Substantial Evidence.**

Plaintiff argues that the ALJ's findings regarding his RFC are not supported by substantial evidence.  (Dkt. No. 7 at 11-12.)  Plaintiff is correct.

The ALJ found that Plaintiff has the RFC "to perform work that does not require exertion above the sedentary to light level; or more than occasional stooping, kneeling, crawling, crouching, balancing and climbing; or more than simple routine repetitive tasks."  (T. at 15.)

"(S)edentary work generally involves up to *two hours of standing or walking* and *six hours of sitting* in an eight-hour work day."  *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)(internal citations and punctuation omitted, emphasis in original).  The ALJ thus found that Plaintiff could stand or walk for two hours and sit for six hours in an eight-hour workday.

As discussed above, this finding is contrary to the opinion of Plaintiff's treating physicians, who  opined that Plaintiff could not stand or walk for two hours or sit for six hours in an eight-hour work day.  (T. at 374-375, 378-379.)  As discussed above, the treating physicians' opinions are consistent with the record as a whole.   Even the analyst opined that Plaintiff would

need to "periodically alternate sitting and standing to relieve pain or discomfort", a limitation that the ALJ did not include in his RFC.

Despite the opinions of Plaintiff's treating physicians, Dr. Shayevitz, and the analyst that Plaintiff's ability to sit was restricted, the ALJ found that Plaintiff could perform sedentary work. Accordingly, the ALJ's findings regarding Plaintiff's RFC are not supported by substantial evidence and remand is appropriate.

### C.   The ALJ's Rejection of Plaintiff's Subjective Complaints of Pain is Not Supported by Substantial Evidence.

Plaintiff argues that the ALJ erred by rejecting his subjective complaints of pain. (Dkt. No. 7 at 13.)

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, Civ. No. 96-9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  20 C.F.R. § 404.1529 (2006); *see also Foster v. Callahan*, Civ. No. 96-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998) and SSR 96-7p.  First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms.  SSR 96-7p.  This finding does not involve a determination as to the intensity, persistence, or functionally limiting effects of the

claimant's pain or other symptoms.  *Id.*  If no impairment is found that could reasonably be expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic work activities.  An individual's statements about his pain are not enough by themselves to establish the existence of a physical or mental impairment, or to establish that the individual is disabled.  *Id.*

However, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been established, the second step of the analysis is for the ALJ to evaluate the intensity, persistence, and limiting effects of the pain or symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities.  *Id.*  A claimant's symptoms can sometimes suggest a greater level of severity than can be shown by the objective medical evidence alone.  *Id.*  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors:  (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 404.1529(c)(3) (2007).

An ALJ's evaluation of a plaintiff's credibility is entitled to great deference if it is supported by substantial evidence.  *Murphy v. Barnhart*, Civ. No. 00-9621, 2003 U.S. Dist.

LEXIS 6988, at *29-*30 (S.D.N.Y. Jan. 21, 2003) (citing *Bischof v. Apfel*, 65 F. Supp. 2d 140,

147 (E.D.N.Y. 1999) and *Bomeisl v. Apfel*, Civ. No. 96-9718, 1998 U.S. Dist. LEXIS 11595, at

*19 (S.D.N.Y. July 30, 1998) ("Furthermore, the ALJ has discretion to evaluate a claimant's

credibility . . . and such findings are entitled to deference because the ALJ had the opportunity to

observe the claimant's testimony and demeanor at the hearing.")).

Plaintiff testified that he could not work because he has "a lot of trouble getting dressed

and sitting in places too long.  I have to get up or lay down in my house.  There is just too much

pain for right now. "  (T. at 468.)  Since his second surgery, "(i)t's coming through little by little,

but it's still there.  The pain is constant."  (T. at 468.)  Plaintiff testified that from the time of his

first surgery on, he could not have a "sit-down type of job" because "it's constantly - it's pain,

sitting too long ... It's throbbing.  Right now I'm throbbing."  (T. at 476, 477)  Plaintiff testified

that he had the second surgery because he never really got better after the first surgery.  (T. at

478.)

Regarding his daily activities after the second surgery, Plaintiff testified that he would

"try to get up, make sure my kids get something to eat, but I can't - I'm not able to really do that

for them.  Because every time I stand, it start - the gravity start pulling around my waist and

irritating my waist.  Then I just stand as long as I can, then go to sleep, get back up and try it

again.  And it never works .  I'm mostly standing and laying down on a typical day ... And I can't

even get dressed ... My wife dresses me and stuff."  (T. at 472.)

The ALJ relied on the first two factors - daily activities and Plaintiff's symptoms - to

reject Plaintiff's subjective complaints of pain.

The ALJ found that "(t)he claimant's daily activities argue against disability.  He testified

18

that he lives with his wife and two children.  He enjoys talking on the Internet and listening to

music.  He reported that he does work around the house such as cleaning, cooking and laundry."

(T. at 19.)

The fact that Plaintiff lives with his family, uses the internet, and listens to music does

not suggest that Plaintiff is able to work.  None of those activities rises to the level of even

sedentary work.  To the extent that the ALJ relied on those behaviors to reject Plaintiff's

testimony regarding his pain, the ALJ's decision is not supported by substantial evidence.

The evidence regarding Plaintiff's cooking, cleaning, and laundry activities does not

support the ALJ's finding.  During the period between his first surgery and his second surgery,

Plaintiff told a consulting psychologist that "he tries to help out with tasks around the house a

little but his family does most of the cooking, cleaning, laundry and shopping." (T. at 338.)

Plaintiff told Dr. Shayevitz that "he cooks twice a week; he states that his family does most of the

cooking.  He cleans once a week.  He does the laundry."  (T. at 341.)  In a form he provided to

the New York State Office of Temporary and Disability Assistance Division of Disability

Determinations, Plaintiff described his activities in more detail.  He stated that when he cooked

once or twice weekly he cooked "microwaveable foods, T.V. dinners" that took him 5-10

minutes to prepare.  He stated the one effect his back injury had was that he could "no longer

cook huge meals, no longer BBQ, rely on the microwave."  (T. at 90.)  Thus, Plaintiff's

household activities were not vigorous enough to be considered the equivalent of sedentary work.

Regarding Plaintiff's symptoms, the ALJ found that "(t)he claimant's musculoskeletal

condition provides a basis for pain and discomfort, but not for discomfort that would rule out

light or sedentary work" (T. at 18) The majority of the evidence the ALJ cites in support of that

19

proposition misstates the record or omits important details.

The ALJ noted that "in January 2003, less than 12 months after his onset date, claimant was cleared to return to work with no lifting greater than 100 pounds above waist level and no lifting greater than 60 pounds above shoulder height". (T. at 18-19.)  The ALJ's decision omits the fact that in March 2003, Dr. Vives decreased the amount he recommended Plaintiff could lift to 30 pounds (T. at 117),  that in April 2003 he decreased the amount again to 20 pounds (T. at 116),  and that in June 2005 he decreased the amount to 10 pounds.  (T. at 378.)

The ALJ noted that "(w)hen seen in April 2003, claimant's pain was less severe".  (T. at 19.)  The ALJ's decision omits the fact that Dr. Vives also noted in April 2003 that Plaintiff "still has some occasional radiating pain with extended sitting" and that Plaintiff should continue physical therapy for three weeks.  Dr. Vives also noted that "(i)f he has persistent symptoms or increasing symptoms, then I believe an epidural steroid injection is worth a try."  Dr. Vives also had preliminary discussions with Plaintiff about revision discectomy.  (T. at 115-116.)

The ALJ noted that "in May 2003, claimant was symptom free.  He denied any radiating leg pain and denied any pain in the back.  Dr. Vives' physical examination found no tenderness about the low lumbar spine and range of motion was improved both in extension and in forward flexion.  Straight leg raise was negative bilaterally.   Motor exam demonstrated 5/5 strength."  (T. at 19.)   The ALJ's summary of the May 2003 note is accurate and does not omit any important details.

The ALJ noted that in March 2005, Dr. Vives indicated that claimant would need only about six months of physical therapy following surgery".  (T. at 19.)  The ALJ's decision misstates the record.  Dr. Vives said that "(t)ypically, I explained that most patients will need

about six months of postoperative physical therapy, before being able to attempt to go back to work and if they are not able to go back to work at that time they typically would be considered at maximum medical improvement.  Any further limitations at that time would be considered likely permanent."  (T. at 427.)

The ALJ noted that "Dr. Shayevitz saw the claimant in February 2004 and observed that claimant did not use an assistive device and was not taking any prescription pain medications. The results of the physical examination found claimant's gait and station were normal.  He was able to walk on his heels and toes without difficulty and was able to perform a full squat.  Grip strength was 5/5 bilaterally and range of motion of the upper extremities was full.  Dr. Shayevitz found no evidence of joint inflammation, effusion or instability.  There was no muscle atrophy. There was full range of motion of the lower extremities.  Dr. Shayevitz found the claimant was able to sit in relative comfort".   (T. at 19.)  The ALJ's decision omitted Dr. Shayevitz's opinion that Plaintiff could sit in relative comfort "*as long as he can change his position and shift his weight*."  (T. at 342.)  Moreover, the ALJ's decision omitted all of Dr. Shayevitz's findings that support Plaintiff's subjective complaints of pain.  In addition to the findings noted by the ALJ, Dr. Shayevitz found that "there are limitations on very prolonged sitting" (T. at 342), that there was "lumbar tenderness and when I pushed gently on the lumbar spine, he stated he felt pain radiating into the right buttocks" (T. at 341-342) and that "straight leg raising test on the left at 30 degrees produces back pain and on the right at 30 degrees produces pain in the right leg, but he states not in the back."  (T. at 342).

The ALJ noted that "(f)ollowing his surgery in May 2005, claimant reported that his back and right leg pain was improved tremendously.  His mobility was also improved."  (T. at 19.)

21

The ALJ's decision omits the fact that Plaintiff continued to use a cane at least through June 2005.  (T. at 401.)

Due to these omissions, the ALJ's finding that Plaintiff lacked credibility is not supported by substantial evidence.  Accordingly, remand is appropriate.

**WHEREFORE,** it is hereby

**ORDERED**, that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[9] for further proceedings consistent with the above.

Dated: September 17, 2007
      Syracuse, New York

George H. Lowe
United States Magistrate Judge

---

[9]     Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).